Your Honor, good morning. My name is William Osterhout. I represent the defendant in this case, John Luong. Mr. Reardon represents Wee-Chee Luong. Mr. Gary Dupkoff represents Natty Chan. Between us, we filed a joint opening brief and reply brief and have agreed to divide our time subject to the Court's approval. Mr. Brosseau is here, who has filed his own brief individually on behalf of Mr. Honglei. If the Court please, I would like to address the RICO issues that are the argument number one in the opening brief. There's no question, Your Honors, in this case, that there was evidence in this long trial of substantial criminal conduct. But the charging decisions of the government here went far beyond, we think, vindicating the interests involved in some robberies and wound up with a rather Byzantine monster of an indictment, which included RICO charges, RICO conspiracy, numerous interlocking and sometimes repetitious conspiracy charges, and a number of substantive offenses, which are then folded into the RICO charge as predicate acts. And this pattern was undoubtedly confusing. Today, we ask the Court to vacate most of these convictions and remand the case because the defendants below, in this case, were charged in a RICO case that was not proven by the government. I think there's nothing more important in enterprise liability than that the defendants shared a common purpose, a common purpose to make money by stated violations of the law. In this case, the government charged broadly a RICO and a RICO conspiracy that featured a common purpose, an alleged common purpose, to rob computer chip companies and to engage in heroin dealing. The proof, however, showed that both of those things occurred. There were allegations of computer chip robberies and evidence to support some of those or many of those. There was also allegations that my client, John LeLong, maintained a heroin business. But we suggest, Your Honor, and submit strongly that the evidence did not show that the heroin business was part of the common purpose that motivated and animated these defendants in forming this alleged enterprise. And we think that's of extreme importance because the first several weeks, I believe, of this trial were taken up with heroin evidence. And there was only one other defendant, Mr. Hong Lei, Mr. Botso's client, who had any involvement in that. Manny Chan had no involvement with heroin and there was barely any suggestion that Wee Chi Long did either. But there was evidence of heroin transacting that took a lot of time up and was alleged to be part of the enterprise. That couldn't have happened, we say, in a joint trial on the conspiracy charges. Is it your position that any heroin trafficking, any drug trafficking, in this whole panoply of events, is wholly unrelated to the computer chip theft enterprise? Yes, it is, Your Honor, and I qualify that only in this sense. The government points... Inevitably, there's a little bit of crossover, but there isn't very much. The government points to a number of people that they say were engaged in John's business, John DeLong, and also in the computer chip robberies. But only one of those, Hong Lei, was really featured in both of those. Hong Lei is one of the defendants and one of the appellants here. And both his drug dealing and his computer chip robberies were rather peripheral and not on a very high level. The drug offense of which there was evidence about happened really before the enterprise is alleged to have started. He's engaged in two computer chip robberies as some sort of entry team. But he's not a leader who plays any role in anything, and there's no sign that those are joined. One's dependent upon the other. I think I may have interrupted Judge Campbell. No, I was just going to say that if I understand the government's position on this, it is that part of their position is that some of the heroin proceeds were used as a sort of a fund for bail and things like that in the robbery side of the enterprise. Yes, Your Honor, I think that is their position. But I believe it's mistaken, because there's no evidence that that was an animating purpose of the enterprise, was to use heroin proceeds for any purpose. In other words, the four leaders met at Elk Grove, the government says, and there was evidence in February and March of 1995. That was Wee Chi Long, John Le Wong, and there was two other individuals that met at that time, Mattie Chan and Mr. Liu, Kevin Liu, who was a government witness at the trial. So those were the four leaders. They met and they discussed, let's join our crews. He testified that it was not a discussion of heroin at all at that time. As a later justification, the government says you used some of the heroin money to maybe bail people out and get them lawyers. But there's no evidence that any discussion of that happened until nearly the end of the enterprise period in February of 1996. There was a robbery of a company called PKI, and the wiretaps were up and running, of course, for all of this. And John Le Wong is heard discussing that he'd like to use some money from an impending heroin transaction to try to help those people so they wouldn't turn on him and on others. But at the same time, throughout, the evidence is replete with people trying to use whatever resources they have. In 1995, and I think August, Mattie Shands talks of selling an automobile to bail somebody out of jail so they won't turn. That's the goal. It's not that as part of a structured enterprise, we're going to take, you know, as part of our joint purpose that we do heroin transactions and then we'll use the proceeds that way. That came up after the fact. And so I don't think the government's established that there was any really advantage from the heroin transaction that went into this robbery. The other thing they point to is that they say manpower. They discussed this Elk Grove meeting in 1995 in February and March. John will bring his manpower, implying that that's from his heroin activities. But that's not any evidence. Mr. Liu, the government witness who was at that meeting, testified it wasn't about heroin. John had people that he could bring in, but there's no showing they were heroin people. And except for Hong Ai Lei, none of them really had any heroin connection. Wang Xin Li, he's another person the government says is a crossover. He did heroin dealing, but no robberies that we know about. Chung Yin Chan, he robbed Ace Micro, but there's no proof of drug dealing. Min Yut Dong did robberies, but he only did one heroin case, and that was in February of 1996, near the end of the thing, and it had no connection one with the other. Tai Chan, William Nagatsuka, another principal player and a government witness, he dealt with Hong Ai in the old days before the enterprise ever started, and Hong Ai was a heroin partner of John Luong. Everything was separate. Everything was separate. And I think if you look at this record, that's what we come across. And now the government is attempting, I think, to go back after the fact, as we sometimes do, and say, well, look, there was this discussion sometime in 1996 or in October 1995 that never came to pass. But there's no showing that the heroin money was shared among these leaders of the enterprise which robbed computer chip companies. There was no showing that it was dependent. One was dependent upon the other. Mattie Chan didn't show up to know anything about it. So I submit, Your Honor, that that's a critical failing. And I would like, if Your Honors would permit me in the time remaining. Before you get to that, there was evidence that the agreement was that 30% of the receipts, I guess we can call them, would be shared among the bosses or the organizers and that 70% would go to be paid to the people that actually did the criminal acts. Now, apparently that was so with regard to the computer robberies. Was that agreement also made with regard to the heroin? No, it wasn't, Your Honor. There's no evidence of any such agreement. So there's no evidence of numerically how the money was to be shared if it was to be shared at all from the heroin business. That's right. The record has no evidence of that. The record has no evidence of that. The closest we get is later in 1996 near the end of the enterprise period where John goes, I'm going to try to use them. I'm doing a heroin deal. Maybe I can use the proceeds to bail people out who were arrested at PKI. But that's different from an agreement to share the proceeds in the manner that Your Honor inquired about. And again, in John DeLong's case, Your Honor, if I might just shift focus just a bit before I yield to my co-counsel, we have an individual argument, I think a very important argument, that the evidence is completely insufficient, that he had anything to do with the robbery of aristocrats, anything. He didn't speak about it on the wiretap calls. He didn't share in the proceeds. He didn't try to fence the product. He didn't know about it. He was apparently kept in the dark about it. The gentleman who did the robbery, his name is Charlie Reff, he's talking on the wiretaps on August 18th, the day of the aristocrat robbery with Mr. DeLong and never mentioning it. The week before he did another robbery which they kept John DeLong in the dark on. We know that from the testimony in the case. And so that alone probably adds about 30 years to the sentence of John DeLong. That robbery of aristocrats and the gun charge attached to it amounted to a tremendous amount of time for him and there was no evidence of it. And not only was it insufficient, but the error was compounded because the district court refused to admit evidence or to allow wiretap evidence that would have further, we say, helped exonerate him. If you don't wind up right now, I would like to wind up. The panel would be willing to give your co-counsel 10 minutes each. If you want to keep going, you're going to eat into their time. Well, I won't want to do it because I have to answer to them, Your Honor. So thank you very much. And may I reserve, if possible, a minute or so for rebuttal. Sure. Put 10 minutes on the clock. Good morning, Your Honors. Dennis Reardon for Dependent He Chi Luong. As Mr. Osterhout mentioned, well, I specifically will deal with a couple of issues, principally the combined issue of single versus multiple conspiracy and its effect on the gun charges, and then a couple of brief comments on an instructional issue and its specific relationship to my client. The instructions in this case occupy 65 pages. I think it's fair to say that they are as complex and lengthy as in any case this court has or will review. The reason that they are so long and complicated is that the government, rather than charging a series of Hobbs Act robberies, giving rather straightforward either aiding and abetting or conspiracy instructions, as Mr. Osterhout mentioned, combined charges of distribution and conspiracy to distribute drugs, which had little or nothing to do with the robberies, with individual robbery and conspiracy and firearm charges, wrapped all of that together in a RICO charge, wrapped all of that together once more in a RICO conspiracy charge, adding as well overarching drug and Hobbs Act conspiracy charges as predicate acts in the RICO conspiracy. I don't know how Lager has made any sense of this. I think if you gave the charge on a bar exam and asked aspirants to the bar to answer some fundamental questions about what they meant, we'd have many fewer lawyers practicing in California today. The government gained an advantage by this massive and multiple overlapping of charges in the sense that a jury looking at 65 pages of charges and 30 pages, 65 pages of instructions on all of these charges would certainly think that something wrong went on here. But we have to now see if the overcharging created problems based on the jury verdicts and the content of the instructions themselves. And what the verdicts do is demonstrate that there was a single overarching Hobbs Act conspiracy here, if there was any conspiracy at all, and therefore that the four individual conspiracies to draw are invalid under Braverman. And the easiest way to make that point clear and to make it equally clear that this argument has nothing to do with the Luong decision issued in an interlocutory appeal out of the Eastern District, which I believe two members of this panel sat on, that it has nothing to do with that claim, which was basically if we've been convicted of a RICO and a RICO conspiracy, we can't be convicted of the individual components of the RICO conspiracy, is to hypothetically strip this indictment of everything. Strip it of RICO. Strip it of RICO conspiracy. We're not relying on the convictions of those as an estoppel at all. Say we had an indictment that charged five conspiracies, which this one did, an overarching Hobbs Act conspiracy, and four individual conspiracies to commit Hobbs Act robberies, every one of those robberies of which are included in the overarching Hobbs Act conspiracy. The overarching one is the Predicate Act. Yes, the Predicate Act, number one in the RICO conspiracy. So let's say it wasn't charged as a Predicate Act but was charged as a conspiracy, an overarching conspiracy, then we have four individual conspiracies of five count indictments. Under Braverman, the jury could find that that single unified conspiracy to commit those four Hobbs Act robberies was indeed, did exist, and it was a single conspiracy. It could find that. If it did, it would have to acquit on the four individualized ones. If it found that there was not an overarching Umbrella conspiracy, then it would have to acquit on that overarching conspiracy and would be free to convict on as many of the individual conspiracies as the evidence permitted. But under Braverman, the one thing it can't do is both of those. Is Braverman concerned primarily with the sentencing double jeopardy or something? Because the problem is that he's not technically sentenced for the Predicate Act. I submit that it is not, Your Honor, because the whole thing in Braverman was not that the all seven convictions remained valid, but you could only be sentenced for one. They set aside the convictions. So in this situation, the jury made a finding. We know that because of the multiple charging here that there was an overarching conspiracy charged in Predicate Act 1. Once it did that, then we know under Braverman it's either one conspiracy or it's multiple conspiracies. It can't be both. We have to set aside the conspiracy convictions. Has Braverman ever been applied to a RICO case? I don't know that it has, Your Honor. It predates the statute, doesn't it? Yes. And, again, what we're talking about here is almost a fortuity that it's a RICO case. Because let us assume that there were only the four individual conspiracies were charged. If they found a single unified conspiracy, you could only have one conviction for conspiracy. So RICO is relevant here only to the extent that because there was a RICO charge, the government put this overarching conspiracy in it, and it permitted us to know that the jury found this to be a single overarching conspiracy. So we have in the RICO context, it isn't important that it's in the RICO context. What's important is that it's a jury finding that it's a single overarching conspiracy on the one hand, and the four individualized conspiracies on the other. Of course, the reason that this becomes a very critical issue, there are so many convictions floating around here and they're so redundant, one could say what difference does it make. The reason it becomes important is the government does not dispute the rule that if there is a single conspiracy, no matter how many objects it has, and no matter how many times a firearm is used during that conspiracy, then there can only be one 924C conviction attached to that conspiracy. And because the only theory of liability for gun use here was a Pinkerton Conspiratorial Liability Theory, if there's one conspiracy under Anderson, there can only be one 924C conspiracy. This doesn't limit the government in any way in future cases, because all it had to do in this case or in a future case is say, okay, we're going to charge you with robberies, which they did here, and we're going to charge you with gun use on a theory that you aided and abetted the gun use. And that would require a finding that the person who was engaged in the conspiracy intended the gun be used. I think the government wanted to avoid that evidentiary hurdle, which requires an intent to use a gun by using a Pinkerton instruction connected to the conspiracy charges. But if the four individual conspiracy charges go, then that leaves you with one conspiracy, one Pinkerton instruction, and one gun use charge. I have responsibility for the two instructional arguments. They're complicated. I'm sure the Court has looked at them closely. I will simply say this. At the end of the day, I think the government would have to say there are deficiencies in the instruction, that is that the robbery instruction given here was really an extortion instruction and did not contain all of the elements of robbery. Obviously, they haven't contested that. But their principal position is, look, if you look at all 65 pages of instructions in here, even if there are incorrect instructions, in other pages in the 65 pages, you can find a correct instruction. That is, in defining a conspiracy to rob, the Court gave all of the elements of robbery, even though when giving specific robbery instructions on the robbery, it did not give all of the elements of robbery and gave an extortion type of instruction, which is really a variant. They say, look at the whole thing. And we would say, given these rather impenetrable 65 pages of instructions, under this Court's decision last week in Lara v. Ryan, the Court said, look, if you've got a flawed theory and a correct theory, you have to be absolutely certain that the government, that the jury relied on the correct theory, or if you can't tell, you have to set the convictions aside. I submit no certainty that the jury sifted through these and found the correct robbery instruction is possible in a case that's so complicated. I see 17 seconds left. I thank you for the 10 minutes, and I'll save those 15 seconds. Thank you. Thank you, Mr. Reardon. Next. Good morning, Your Honor. It's Gary Dukov on behalf of Appellant Matty Chan. It's my responsibility to address the wiretap issues. There are four of them, and I'll try and get through the four in the time allotted. Even here in the midst of 2006, wiretaps continue to be a statutorily disfavored investigative method. Less than two months ago, a panel of this Court in United States v. Statsvelt referred to wiretaps as, quote, a grave threat to privacy, end quote, which they obviously are. The Supreme Court, in a leading case, Giordano, back in 1974, stated that the use of wiretaps are to be limited to those situations clearly calling for the employment of this extraordinary investigative device. And again, in Giordano, the Court said these wiretaps are to be used with restraint. Courts are supposed to demand, another quote from a panel of this Court in United States v. Calton, punctilious obedience to the statutory scheme of Title III. And the courts are to construe the Title III provisions narrowly to advance the privacy protection goals of the Act. So these were the background principles that the district court was supposed to have applied to the wiretap issues it confronted below. And repeatedly, time after time, it ignored those principles, gave the government the benefit of every doubt. Every time troubling facts were presented to it regarding mistakes made by the government or active misrepresentations by the government, the district court repeatedly ruled in favor of the government, which my contention is that if these background principles had been properly applied, should not have been ruled upon that way. You know, the exclusionary rule still exists. It may exist by one vote. It may not be with us much longer, but it's still the law of the land, and it ought to be enforced. And my suggestion to this Court is it's exactly in a case like this where enforcement would need something, where the government has invested a great deal of resources, where the defendants are clearly factually guilty of some offenses, and it would be a powerful reminder to governmental agents about respecting the constitutional rights of the citizenry. So turning to the facts of the case, the first issue was purported misrepresentations and omissions regarding necessity. And of course we know that the government was responsible to present a full and complete statement regarding necessity, and one principle we all agree on is that the Court is supposed to take a common sense and practical approach to the application of the necessity requirement. My argument is that there was no way that the Court, the issuing Court, could have ruled intelligently on necessity because the government itself had no idea whether it needed this wiretap at the time it saw it, that it applied for it. And the reason that is is because it was just on the virtual eve of the application that a veritable treasure trove of new leads had been uncovered. And instead of doing what the government ought to have done, which is to see what these leads mean and what we can do with them, they instead rushed in with this application. So this is not a case where we're asking the government to have pursued every lead to the bitter end or to have exhausted every investigative technique. We understand there's no requirement on the government to have done that, and we're not arguing that. What we're saying is that they just have this whole series of new leads that they did absolutely nothing with. And I would just point out, and Ms. Goodman can correct me if I'm wrong, all of these facts are undisputed. It's undisputed about these new leads, and I'll just run through how powerful they were and how they carry the potential for great investigative development. And also undisputed is that the government just simply withheld all of these facts from the issuing court. So we attribute to everything the government knew and all its persona to the application for this wiretap? In other words? I understand the question, Your Honor. And that's certainly the state of the case law, that you look at the government as a whole and not just, you know, the Atheist's knowledge. But I'm not asking the court to just, you know, look anywhere in some distant branch of the government. It's the people involved in this investigation that knew these facts, whether or not it was the Atheist. My argument is the Atheist knew most, if not all, of these facts. But even putting that point aside, it's the people directly involved in the Luong investigation that knew all of this. And I don't think it's a close question that they made a conscious, purposeful decision to withhold all of these facts from the issuing court. And just to get the timeline straight, the application was made on August 1st of 1995, and apparently the Atheist sent a draft off to Washington on July 24th, a week earlier, for approval. So here's what happened in the lead-up to that. It was between July 21st and July 23rd. So just, you know, the days right before the submission of the draft, there was a surveilled, undercover buy in New York. The confidential informant who was making the buy was off... Mr. Luong, the purported drug kingpin, offered this confidential informant to accompany him to New York to do the buy. And that fact was omitted from the affidavit. The fact that the kingpin is personally willing to travel with and deal with this confidential informant was omitted. Then the surveillance takes place between July 21st and July 23rd, and they learn the identities, the residences, the license plate numbers, and the phone numbers of close relatives of a fellow named Bing-Yi Shen. And if you look at the indictment, he's the fourth individual listed after the three appellants of John Luong, Hui-Chi Luong, and Mattie Chen. It's Bing-Yi Shen who was purported to be, and I believe evidence at trial established, he was John Luong's drug partner. So they had evidence just uncovered in the days right before the draft was submitted that would have, pursuing traditional investigative methods, allowed them to uncover the drug partner of Mr. Luong, Mr. John Luong, which was exactly what the affidavit said was their goal, or at least one of their goals, in the affidavit. And that was not told to the issuing court. And then there was, at about the same time, on July 12th, some nine or ten days earlier, this unbelievable development on the robbery front, which is that they arrested eight people in Minnesota, all of whom they had reason to believe were connected to John Luong. And in just a few days between July 12th and July 24th, the submission of the draft, the FBI had developed an incredibly prescient organizational chart of Luong's group that turned out to be exactly consistent with the evidence submitted years later at trial. And they did that based only on the review of five or six phone calls from one of the arrestees. And this is all in the memorandum, an FBI memorandum that was authored in Minnesota and sent to the Luong investigators prior to the July 24th submission. And they also stated outright that there were 600 unreviewed taped phone calls from the other arrestees. And if they were able to make this enormous stride listening to just those few phone calls, certainly it would not be unreasonable for a court, as part of the necessity burden, to ask the government to at least review, you know, these leads that had already produced enormous results before they rushed in with a wiretap application. And just one other fact that was omitted was that they had interviewed an informant who gave them the information that led to all of their arrests in Minnesota. And they also stated in a search warrant that was executed in Southern California that there was a second confidential informant who corroborated what that first informant had told them. And that also was omitted from the affidavit. So, again, this is all undisputed, I believe. And the same kind of approach to the truth, you know, which is that minimum reckless, which is all we really needed to establish below to secure suppression, continued through the district court proceedings. The district court itself was troubled enough by the affiant testimony that she commented on it in her order about how evasive she was. She didn't even bring her file with her. She couldn't answer questions because she hadn't refreshed her memory and her file wasn't there. And the government made unquestionable misrepresentations in their opposition to the motion to suppress. I'm running out of time, I see. So I've only covered the first issue. But the misrepresentations are that the FBI didn't know the identity of the informant that gave them the information about Minnesota, which was clearly not so, and that was proven at the evidentiary hearing. And just to show you how bad it got, they were claiming that the Ah Sing, which is John Luong's nickname who was identified in the Minnesota memorandum that was sent to the Luong investigation group in San Francisco, there was no proof that they knew that Ah Sing was John Luong, which clearly was not so. And I'd like to just reserve whatever time I can. You folks are going to have to decide who it is that steps up to do the rebuttal by lottery or whatever. I have a quick question for you, which will not come against your time. I got the impression from your brief that it's your position with respect to your client that if the evidence is insufficient for RICO conspiracy, then it must be insufficient for the substantive RICO count. That's right. Is that correct? That is correct. Do you concede the opposite? Would I concede that if the evidence is sufficient for substantive, it's sufficient for conspiracy? Well, I'd have to think about that. I'm not asking you to concede that it is sufficient. But you make the argument in your brief that it's all or nothing. Is it all or nothing both ways? Well, you know, I obviously don't want to concede something, you know, that my client's going to regret that I conceded. And I haven't thought about that question, but it's different elements. And so, you know, I just don't know an answer. I'll cover my head for that. That's fair. But just on the individual issue, of course, it is Mattie Chan who the government conceded didn't know anything about the drug dealing. And certainly that would apply to both the substantive RICO and the conspiracy. Okay. Thank you. Your Honor, it was important that there be at least three minutes. I will let Mr. Reed and I join the separate briefs. And my name is George Plotkin. I said at the start of this that you can have ten. If you only want three, that's fine. Well, actually, I only – and that's fine. I'll continue. I said each of you could have ten. Thank you. Now, if you don't want the ten, take three. I'll take as much time as the Court will give. Ten. It starts right now. Thank you, Your Honor. George Plotkin on behalf of Hong Ai Lei. Your Honor, I've joined the joint brief. And to the extent applicable to Mr. Lee, I have also joined the separate briefs filed by Mr. Tan, Mr. John Long, and H.E. Long. The issue I do want to address to the Court is the constructive amendment of the count to the racketeering conspiracy. This case, on behalf of Mr. Lee, went to trial on the allegation and the evidence presented before the grand jury, presumably, that he was indeed a middleman, that he had some – that he was in charge of crews, that he recruited others, and that he, in fact, went to other locations to look at potential robbery sites. So, essentially, he had a management in this racketeering enterprise. And that was the allegation presented before the grand jury, and that was count one and count two. Now, the evidence at time of trial did not support that allegation. In fact, he wasn't the middleman. He was, at most, a crew member on one robbery. And argued below was the fact that he, because of the constructive amendment of the indictment, he was prejudiced because the indictment said he was a person that had operation and control of the racketeering enterprise, and that's why he was there. In fact, he wasn't. And the court granted the Rule 29 motion saying that there was insufficient evidence that he had control and management over the racketeering enterprise. But this is applicable to count two also. If he's not a middleman, then he shouldn't have been indicted, and the government constructively amended the indictment to his prejudice. Well, but he got his Rule 29 motion because at that time you needed to be a manager or something of the enterprise, and that isn't the law now, is it? Well, Your Honor, at the time, count one was granted because, yes, he wasn't an operator and manager, so the Reeves test applied. The Reeves test still applies to the substantive racketeering count. It does not now, under Ninth Circuit President Fernandez, apply to racketeering conspiracy. And now I've raised that issue on my brief and I've submitted it. I don't want to argue that issue right now before the court. But I guess it might affect whether the allegation that he's a middleman is at all an essential part of the indictment. In other words, is it just surplus? And the government has argued that it's surplus, and I argue that it's not. It's a critical allegation presented by the government and presented to the grand jury and not proven by the government in this particular case. I mean, the element is knowingly agreed to facilitate a scheme which includes the operator or management of a racketeering enterprise. Now, included in that definition of the element they need to prove for racketeering conspiracy is the fact that you need to show what particular role a person has. And it's not enough to say, well, the grand jury would have indicted him anyway if it knew he was just a crew member of the Hopkins systemation robbery. There's no evidence to suggest that they would have. Because as presented before the grand jury, they presented evidence or something, or at least the proffer, that this person played an important role in both the racketeering enterprise and the racketeering conspiracy. And because of that important role, that person should be indicted on counts one and count two. And when the government puts down evidence that's substantially different, then we have a constructive amendment. And also, tied into that, you have a prejudicial variance that basically you've shown something different. And the government wanted to prove that he was an important person in this racketeering enterprise and racketeering conspiracy, but could not. And the government's argument is that, well, if it's not surplusage, we proved it anyway. Well, that's belied by the fact that the court, considering all the evidence in this case, said no. He's not a management and an operator of this racketeering enterprise. I'm granting the motion for Rule 29, the insufficiency of the evidence. So I submit to the court that if we look at the case law and the applicable case law regarding constructive amendments and prejudicial variances, that's what we have for this case. And, in fact, because of that, the conviction for count two should be dismissed by this court. Your Honor, can I cede my time to my co-counsel? Because we had agreed to certain things in this case. Sure. We can give what time is remaining for the rebuttal. That would be fine, Your Honor. I think I would appreciate that, and my co-counsel would. Thank you. Not a problem. We'll hear from the government at this time. Thank you. Good morning. I'm Nina Goodman. I represent the United States. I'd like to talk about the firearms counts first. The government strongly, strongly disputes that a single conspiracy could not give rise to the Pinkerton liability for all of the firearms counts. The firearms counts were charged. Each had a separate predicate robbery. The jury was instructed that the defendants were charged only with using and carrying firearms during and in relation to each of these separate robberies, and the court emphasized that in its instructions. Right before it gave the Pinkerton instruction, it reiterated that the defendants were charged with using and carrying a firearm during and in relation to a crime of violence, specifically in this case, armed robbery. The fact, even if the court concludes that there was only one conspiracy, that does not affect the defendant's liability for separate counts of using and carrying firearms during and in relation to separate robbery counts. In for a penny, in for a pound. Well, in for each penny separately, Your Honor, because they were each supported by a separate robbery count. Now, turning back to the conspiracy. What's the best case on that? On that? Well, the case is cited in the government's brief where there were separate 924C counts that then each was supported by a separate predicate count. In at least some of those cases, there was only one conspiracy. For example, there could be one drug conspiracy, separate drug transactions, and a firearm used in each of the separate substantive deals. And as long as it's charged and proved in that way, as it was in this case, separate 924C counts are permissible. That's with Pinkerton liability only, in other words. Yes. There can be Pinkerton liability. In many cases, there will be one conspiracy. Often an indictment will have a drug conspiracy, several separate transactions, and then if a firearm was used during and in relation to the separate substantive transactions, and that's certainly the charge, and here it was crimes of violence, that will support separate 924C convictions. Like in Castaneda, for example, the court says if the elements of two predicate offenses are different, each may form the basis. I'm not sure which of these cases had only one conspiracy count, but I think when I looked over them, there were several. You may have Fontanilla, Andrews. The cases that are cited in the government's brief about multiple Section 924C charges, there's not a requirement that each be based on some separate conspiracy. Often there will just be one conspiracy. Turning back to the conspiracy count, the real question in this case, I think the way counsel defines, he said let's take a hypothetical. The hypothetical completely changed the issue in this case. The critical fact is what they are pointing to as the single overarching conspiracy charge was a racketeering act. The crime the defendants were charged with and convicted in that count, in count two, was a RICO conspiracy. And so clearly that falls under the Supreme Court's decision in the Albernaz case, which changed the Braverman or clarified the Braverman rule. And it said even a single conspiracy, if they're different statutes, it doesn't matter. You can have separate sentences. What the defendants were convicted of in count two, the RICO conspiracy, regardless of what racketeering acts were charged or found, was a conspiracy to violate RICO. And that's a separate conspiracy from a Hobbs Act conspiracy. It violates a different statute. And that's how the government, at least, reads the earlier Luong decision. Even apart, leaving the RICO charges completely out of the case, if you're looking at four Hobbs Act conspiracies, the defendants can still raise the question, were there really four conspiracies or was there only one conspiracy? Well, Your Honor, as I understand their argument here, what they're saying is we don't get any sentence for the Hobbs Act conspiracy because obviously the RICO, that's separate. I mean, the RICO, they got a RICO sentence. And then what they're trying to say is even though we receive no punishment, you aren't punished for the racketeering acts. You're punished for the RICO conspiracy. We can't be punished at all for any of the Hobbs Act conspiracies. Now, clearly, the holding of Braverman, the case says, is that if there are several conspiracy counts that charge the same conspiracy, and as we know under Albanaz, that means the same conspiracy under the same statute, then only the single penalty prescribed by the statute can be imposed. The defendants are saying we don't get a single penalty. We get none. All our Hobbs Act conspiracies have to just go because the jury found a racketeering act, even though we weren't punished, of course, for that racketeering act. Well, as a fallback position, they might be willing to say, all right, we can only be punished for one Hobbs Act. One of the three. And they might say that, Your Honor. They haven't made that argument. But if they did, I think that would be a case where the court would apply the Stoddard test, the test that the court has developed, and in that case we'd have to look at, were different people charged in each count? Yes. Did they involve different conspiracies to commit different conduct? Yes. Were they different time periods? Yes. And so we would say that if they had made that argument, and they haven't, we would respond and say, well, those are different. The court could find, I mean, obviously the defendants have the burden, and those are different conspiracies. Even worst case, one, all the three Hobbs Act conspiracies would merge for purposes of sentencing and they could get sentenced on only one, even if the court found they had met what the court had said is a pretty heavy burden under the Stoddard test. That still, not to repeat myself, that still would not affect their liability for committing separate uses of a firearm in connection with separate substantive offense. The 924C counts were counts 12 and 15? Let me see. Is that right? The 924C counts were, let's see, count six, oh, that one, 12. With respect to the defendant, John Luong. Oh, John Luong. Let's see. With the 924. 12, yes. 12. And 15, yes. And I'm looking at the sentencing document and those sentences are consecutive. Yes, that's right. Yes, the second 924C is imposed consecutively. That's right. And that's permissible as long as there are separate predicates that can be separately charged and separately proved, which there were in this case. I'd like to go back now to the RICO conspiracy issues. Oh, there's one other thing I wanted to mention in response to counsel's argument on the wiretaps. If I could just briefly say the government does strongly dispute most of the facts. They were contrary to the district court's findings. The district court very carefully looked at the wiretaps in this case, had extensive hearings, commented to the defendants. You called every witness you could. You didn't get what you were looking for. And made very extensive findings, which they have not shown are clearly erroneous. And the issue here is whether there was necessity for a drug, a wiretap to investigate drugs. And I would particularly urge the court to look at the district court's findings on materiality, and particularly the fact that the first wiretap was only up for a few days and John Long switched off using that phone. Two weeks later, an application with everything in it that the defendants say should have been put in the first one, was again issued. The court again found necessity. There's simply, even if the court's findings on whether there was deception were completely wrong, which they're not. We submit they're clearly correct and well supported by the record. There's no showing of materiality here. As long as you're on wiretap, what's the government's position with respect to which district is the appropriate district to authorize the tap? Where the phone is, where the user of the phone is, where the communications are first intercepted? Well, Your Honor, our position is that the word interception, as all the courts have found, is defined as it is in the statute to include oral, oral, or other acquisition, meaning where oral, meaning where it is first heard. And particularly in the day of cell phones, this case is obviously even sort of at the very beginning of cell phones, but it becomes less and less obvious where a phone is located. I mean, it can be taken anywhere. You can buy your cell phone service anywhere. It's not like a landline. I'm not familiar with cell phones. I'm just looking for a simple answer. What's the government's position? Well, the government's position is that it's where it's first intercepted, as every court has held. We believe if you look at the courts of appeals that have decided this, they're very clear that it's where it's orally acquired. That's the language of the statute. And where was that in this case? That was in San Francisco, which was where the investigation was located and where it was supervised out of and where much of the criminal conduct took place and where the phone was often used. And so we think those courts are correct, and they're just even more correct. It's more reasonable to interpret the statute that way in the day of cell phones where there isn't a set location. So does the court have any other questions about that? I'll go back to the RICO issues. On the RICO, it seems clear that the RICO enterprise included both the drugs and the robberies, when the evidence is viewed in the light, as it has to be, obviously, for sufficiency claim, in the light most favorable to the government. Mattie Chan directly brought the Luongs into the enterprise, into the robbery business more directly because he realized he had a problem. His people, and there was evidence about this at trial, the people he had working for him were stealing and blind. They were hiding stuff. They were taking it and putting it and taking it. So he wasn't getting the profit from the business that he needed. To make this business successful, they needed manpower that they could control. And manpower is the word used by John Luong on the wiretaps. He tells other people, I have manpower. You don't have to go out and get it on the street. I have people who have worked for me for a long time. And so the defendants have this meeting, and they decide we're going to use the manpower that the Luongs have. You can say, well, how do we know it was drug manpower? We know because immediately after that, people who were involved in the drug dealing, including Hong Ai Lee, start working on the robberies. Hong Ai Lee is involved immediately after that, shortly after that, in the Hawkins robbery, which occurred in March, right after the meeting. They also began to use drug money. For example, as early as July, there's a wire transfer, which was introduced at trial, from the place where John Luong had his drug business up in Massachusetts. And he's sending money when people were arrested in this Minnesota arrest, and he's sending money to be used for their bail or their legal fees and transferring $1,000. And so the jury could easily infer that the other defendants are benefiting from the drug money. They're clearly benefiting from the manpower because that's what's making the enterprise work. John Luong did have good control over his people. There was a lot less side businesses going on with people ripping stuff off. Did the government agree that Mattie Chan, when he brought this manpower into the operation, didn't know anything about the drug business? The government conceded at trial that there was no evidence that he knew that it was drugs that was the source of the manpower. Is he then a member of the enterprise or a conspiracy if he doesn't know half of its business? Your Honor, the boilerplate RICO law, including the seminal case from the Fifth Circuit and the Elliott case, which has been cited by this Court, is that a defendant doesn't have to know the details or every component of the business. He has to know what the basic nature of the business is, that it's engaged in a racketeering, it's using a pattern of racketeering to operate the enterprise. And he certainly knew that. I mean, he was the one who benefited most directly, Mattie Chan was, from bringing this other component in, because he was the one who had been complaining to Kevin Lu, these guys are stealing from us. And, you know, we would think he was going to get a great deal from the robbery, and then it would turn out, oh, we only had, you know, this much, and then the rest would be siphoned off. And so given that Mattie Chan directly reached out and brought this in, that's the evidence, that regardless of whether he knew exactly where John Luong was getting the manpower, he clearly knew he had some source of people who would do illegal work for him, that that's sufficient to make him a part of the enterprise. And so we believe that the jury could, viewed in the light most favorable to the government, the jury could clearly find the existence of the enterprise charged in the indictment. But I also want to say that even if there was a variance between the indictment and the proof, this would not require reversal. I mean, there was no, the defendants were clearly unnoticed. They could have been charged with a RICO-based, it's not, the government's charging decision wasn't based on the fact that they could bring in the drugs, it seemed that that's what the enterprise encompassed. Clearly they could have been charged with a structured RICO enterprise, based just on the profit-sharing, the hierarchical nature of the robbery business. So now in their reply brief they claim, well, what about the spillover? We suffered spillover. Well, I counted the pages in my notes of the transcript. The drug evidence was five days of a four-month trial. I mean, that's what I counted when I went back to my notes. And so the evidence was clearly compartmentalized, but also you have to look at the weight, the overwhelming weight of wiretap after wiretap of the defendants directing and operating this huge RICO enterprise with numerous robberies, violence, guns, people ordered to lie on the floor with guns at their heads, tied up, and compare that to five days of, yes, I bought drugs from an informant and we exchanged a package. That isn't the kind of spillover prejudice that the courts have found so overwhelming, that it would mandate reversal, where the defendants were clearly on notice and knew what they were facing and the crime charged. There was nothing in the proof that differed from what was charged in the indictment, even assuming, which we dispute, that the government failed to prove all of what was in the indictment. I'd like to talk just, I guess the only other thing I really need to talk about is the instructional issues. And I just want to say that we do think the robbery instruction was absolutely correct. The court didn't just at some point in these pages start defining robbery. It defined robbery clearly and correctly for the jury, both in the context, right before it gave the first robbery predicate act in the RICO. It said, here's what robbery means. The defendants are charged with robbery. And then also immediately before it gave the substantive robbery counts, it says, here again is the robbery, and this applies to these robbery counts. The word robbery probably appears 200 times in there, in the instructions. The word extortion nowhere appears. How do you respond to their statement that the one instruction was an extortion instruction because it deals with forcing the people to give up the... Well, Your Honor, I respond... It looked to me like it was about half of an extortion instruction. Well, Your Honor, I went back and looked at the definition of extortion in the Hobbs Act and actually the words or fear that they italicized in the brief, those are in the robbery definition as well. What seems to differ is that extortion has to be with the person's consent. There was no instruction about with consent. Nothing was said about that. Extortion was not instructed on. And instead, robbery, which also uses the force or fear language, just like the extortion definition, has to be from the person or the presence of another. And the jury was twice instructed on that. There was no objection at trial to any of these instructions. Nothing was said about them. This definitely wasn't plain error, especially when you look at the number of times the court told the jurors, these defendants are charged with robbery, the correct definition of robbery, the fact that the verdict form said robbery all over it, the fact that the closing arguments referred only to robbery. To show plain error, the defendants would have to show that somehow a jury that never heard a word about extortion during an entire trial and heard months of evidence about people being robbed with guns at their heads and was told to convict only on the charges in the indictment and was argued to about robbery and had a verdict form that said robbery, somehow that jury decided they were going to convict these defendants based on extortion. And we think the court can be absolutely, definitely sure that's not what happened here. Ms. Goodman, may I ask you to discuss what appears to be the fact that John Long did not know about the aristocrat robbery and didn't seem to participate in it. That's the argument that's made in the briefs in here today. To what extent is John Long responsible for this aristocrat robbery? Well, Your Honor, the evidence on the aristocrat robbery, the defendants point out and it's correct, the word aristocrat isn't mentioned on the tape that John Long is taped on about this time. The government presented strong evidence that John Long was supervising and directly directing the activities of Charlie who, there's no dispute, committed the robbery. He was directing the people who were doing the robberies or at least the leader. Yes, he was absolutely directing the leader. And if I can just summarize quickly some of that evidence. Well, first of all, Chan, who had been in charge of Charlie, had given him, had told Kevin, I'm going to give him to John because John can handle him. And Long actually met with Charlie two days before the robbery. The surveillance photos were introduced at trial. He told Michael, who was a confidante, the same day that Charlie was working for the company, which is the word that he used, John Long especially liked to call it the company, and that he had given Charlie $10,000. And generally what they did is they give people, the bosses funded the crew chiefs like Charlie to pay their people to conduct robberies. So the fact that he had given him one bing, which means $10,000, was significant. And this was just two days before the aristocrat robbery took place. Immediately in the days preceding the robbery, Charlie and John Long had repeated telephone conversations. And it was clear that they were not just looking at one target. One target they were looking at that they did mention by name was called Future, which was a computer company. But it's clear that they're looking at multiple targets. And when Long talked to Michael in the same conversation, he said, well, we might as well do both jobs this week. And then when he's talking to Charlie, they're repeatedly discussing the use of guns, which they call a piece, and the use of phones. And so it's clear that they're planning robberies. They're planning robberies in the Bay Area. Now, there was another robbery. I believe it actually occurred about a week after, and that was in Southern California. And for that robbery there was evidence that Mady had told everyone, he had told Kevin Liu, don't let John Long know, we don't want to share the money with him. That was what Maddy Chan said. There's no evidence like that relating to the robberies that Charlie was committing when he was working for John Long in the Bay Area. Were these alleged as one Hobbs Act conspiracy or separate ones, these individual robberies? Well, Your Honor, the aristocrat robbery was alleged as one conspiracy. Not every robbery was charged. I guess what you're saying is you're saying that John Long was sort of generally telling his crew chief, you know, we're going to do some robberies. But by your theory of charging, each of those is a separate conspiracy, I guess. Well, some of them weren't carried out, Your Honor. I mean, they were clearly discussing. What I'm saying is you're saying it's all one thing when we are trying to charge him for the aristocrat robbery, but when we're looking at conspiracy counts, they're really separate. Well, I don't think there were separate conspiracies to commit robberies. The robberies that they were charged as conspiracies were robberies that actually occurred. The way these people operated, the way the defendants operated, is they would clearly be considering many robberies at the same time. They would identify a whole bunch of targets, and they would drive around and look at these stores. And sometimes Charlie on one of the tapes that occurred around this time says to John, you know, you have to just go in with your heart. You have to go when you feel like it. And sometimes they would just decide, we're going to hit this one today. And it may be that that's what, after John and Charlie had discussed a number of these robberies and the guns, it may be that Charlie decided, well, I'm going to go and do aristocrat today. And we submit that although the evidence is circumstantial, that it was strong enough for a jury, viewed in light that's favorable for the government, it was strong enough for the jury to conclude that John was directing Charlie, and that even if Charlie said, well, today's the day, my heart's telling me, they had discussed, you know, a different robbery, the heart's telling me aristocrat's the one for today, that he was acting in John's direction and with John's money. John Luong was funding this robbery. He had given Charlie $10,000 two days before to pay the crew members or to get ready for the robbery, and that that was enough for the jury to find that John Luong directed Charlie to commit the robbery. If the court has any further questions. Well, I don't see any. Thank you, counsel. Appreciate your argument. Rebuttal? Who won the vote? Mr. Reardon. And it will be brief. On the wiretap issue, I'll dispense with that quickly. Judge Hawkins' question indicated his great familiarity with the contention in the brief on the jurisdictional issue. He put a question to the government on that. Mr. Dufkoff's explication and response to the government's position is laid out better in the brief than I could, and we rely on it. Secondly, on the question of the RICO enterprise, the government had the option of, if it was going to charge RICO as opposed to individual robberies, charging a single purpose of engaging in harbs racked robberies, a common purpose. It could have done that. This would be a much simpler case. It chose to frame an enterprise that included drug dealing with all the tremendous advantages that involved, and the fact of the matter is that there just isn't a sufficient basis to conclude that a common purpose of, certainly of defendants Heechi Luong and Mattie Chan was to engage in drug dealing at all. It chose a larger enterprise. It had an obligation of proving a common purpose as to that whole enterprise, and it failed to do so, and for that reason the RICO should fall. The government says, well, there's no prejudice here, and yet when the court raised the question, when Judge Thompson raised the question, well, where is the evidence of guilt of John Luong in aristocrat, there really is none. In fact, as Mr. Osterhout pointed out, there also was an exclusion of evidence, exculpatory to Mr. Luong on that question on the grounds that the evidence might be damaging to the other co-defendants. I submit that it's precisely the conviction of Mr. John Luong on aristocrat that indicates that his right to a fair trial on a charge such as aristocrat was prejudiced by the government's forceful joinder of these two different animals, the drug dealing and the robberies, so that it could get before the jury evidence of drug dealing, and I submit that five days' evidence of drug dealing is very likely to prejudice any jury's ability to fairly consider some undrug-related charge. Turning very quickly to the arguments that the government began with, which are in my bailiwick, we are not agreeing that you can have a single conspiracy as agreed, as occurred here. You could get five gun charges out of it, five 924Cs. All you have to do is have your theory be a member of the conspiracy walked in and used a gun on four occasions. Boom, he's guilty of four charges. Or a co-conspirator, aided and abetted, had the intent that he use a gun, that the perpetrator of the robbery use a gun. Boom, jury finds that to be true, guilty on four charges. What you can't do is what the government did here, choose to forego those theories and link the gun charges solely to conspiracy. At Page, in our argument, we give the court's instruction on gun charges, and it clearly says the only theory. Everybody agrees the defendants had nothing to do with guns. Judge Patel said, now, you may be confused by this gun charge, because they didn't use guns. Here is the Pinkerton theory. Since the only theory was the Pinkerton theory linked to conspiracy, and there wasn't any findings of linking the gun use to each robberies with the intent that it would be required, if there's only one conspiracy, there's one gun charge. Do you have a case for that? Well, Anderson is the case, and all of the cases that it cites, including the Ninth Circuit Authority, United States v. Fontanilla, Page 63 of our brief, says one conspiracy, if it's linked to one conspiracy, no matter how many gun uses there are, it's one gun charge. As to the argument that somehow, let's posit this. You have four separate conspiracies. That's all that's charged in a case. A judge is troubled by the notion that there's only one, really, overarching. He asks for a special finding from the jury. They convict on all four conspiracies, but, yes, find that it's a single conspiracy. Well, then the judge would be controlled by Braverman. It doesn't matter that it was within a RICO context. We had a jury finding that there was one conspiracy. That controls the finding of four individual conspiracies. As to the argument that there's no punishment then, Judge Patel, if this goes back and the RICO charges are upheld, can give the defendants under Booker whatever she feels an appropriate sentence is. The fact that the individual conspiracy charges are set aside does not mean that the defendants would escape any responsibility for conspiring to rob four different institutions. Thank you. Thank you, Counsel. One question for the government. Do you agree that all defendants preserve their Booker issue? Yes, Your Honor. The defendants raised Apprendi back in 2001, and we think this is preserved Booker climate. It should go back to RICO. So they're entitled to full resentencing under the advisory guideline? Except if I could just point out, Your Honor, on the gun counts, they should not be resentenced because their sentences were statutory on those counts. Okay. Thank you. Thank everyone. Terrific argument. Thank you very much. The case just argued will be submitted.
judges: Canby, Thompson, Hawkins